# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**MARTHA AMMONS,**

      **Plaintiff,**

**v.**

**ALLY FINANCIAL, INC.,**

      **Defendant.**

_____/

**CASE NO: 3:17-0505**
**Judge Crenshaw/Brown**
**Jury Demand**

**PLAINTIFF'S BRIEF IN RESPONSE TO THIS COURT'S ORDER
REQUESTING BREIFIG ON THE RECENT D.C. CIRCUIT DECISION**

1

## I.    INTRODUCTION

In connection with pending motions for summary judgment, this Court has ordered supplemental briefing to address "whether, and if so how, the *ACA International* [*v. Federal Communications Commission, et. al.*("*ACA Int'l*"), Case No. 15-1211, --- F. 3d ---, 2018 WL 1352922 (D.C. Cir. Mar. 16, 2018)] decision is relevant to the case at bar." (Doc. 97, p. 2)   As noted by this Court in that order, "[a]n issue of importance in this TCPA case is the revocation of consent to receive telephone calls." (Doc. 97, p. 1)  The issue of revocation is indeed addressed in the *ACA Int'l* opinion and, as will be explained below, its discussion of the issue greatly favors the Plaintiff's position.  Furthermore, the Plaintiff will also briefly touch upon the ATDS issue discussed in the *ACA Int'l* opinion, as well as Ally's "totality of circumstances" arguments.

## II.    *ACA International* Supports The Plaintiff's Position That Consent Was Revocable.

### A.    *ACA International* Directly Contradicts Ally's *Reyes* Arguments.

In its briefing order, the Court quite wisely draws specific attention towards an excerpt from the *ACA Int'l* opinion that states in the very first sentence that "[i]t is undisputed that consumers who have consented to receiving calls otherwise forbidden by the TCPA are **entitled** to revoke their consent." (Doc. 97, pp. 1-2, quoting *ACA Int'l*, 2018 WL 1352922, at *17-18)("emphasis added).   As is apparent, this language directly conflicts with the holding in *Reyes* that, when it is "included as an express provision of a contract[,] . . . 'consent,' as that term is used in the TCPA, is not revocable." *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 57 (2d Cir. 2017).   Moreover, this discord between the opinions is hardly surprising, as the now upheld portions of the 2015 FCC order clearly stated that "an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA. . ." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7970 ¶¶ 6-7 (2015) ("2015 FCC Order").  The practical

2

effect of the unsound holding in *Reyes* is to do exactly that.

The validation of 2015 FCC Order as it relates to revocation also has other substantial benefits for the Plaintiff's position vis-à-vis *Reyes*. In particular, the 2015 FCC order explicitly stated that "we do not rely on common law to interpret the TCPA to include a right of revocation." *Id.* at 7995. This dramatically undermines the rationale of the *Reyes* opinion, which is premised entirely on a purported common law analysis. *See Reyes*, 861 F.3d at 57 (noting that the basis of its holding was that "the common law is clear that consent to another's actions can 'become irrevocable' when it is provided in a legally binding agreement"). By sustaining the FCC's rulings as to revocation in the 2015 FCC Order, the *ACA Int'l* decision reaffirmed the that the FCC was acting "pursuant to its authority under the TCPA" in providing guidance as to **statutory** interpretation. ACA Int'l, 2018 WL 1352922, at *2. The common law analysis in *Reyes* was thus in error.

It is anticipated that Ally will attempt to argue that certain portions of the *ACA Int'l* opinion favors its *Reyes* arguments. In particular, it is likely to point to the following language in that opinion:

> Finally, petitioners object to the Declaratory Ruling insofar as it might preclude callers and consumers from contractually agreeing to revocation mechanisms. The Commission correctly concedes, however, that the ruling "did not address whether contracting parties can select a particular revocation procedure by mutual agreement." FCC Br. 64 n.16. The ruling precludes unilateral imposition of revocation rules by callers; it does not address revocation rules mutually adopted by contracting parties. Nothing in the Commission's order thus should be understood to speak to parties' ability to agree upon revocation procedures.

*ACA Int'l*, 2018 WL 1352922, at *18. However, this paragraph from *ACA Int'l* is entirely consistent with the opinion's earlier pronouncement that there is an unabridged entitlement to revocation of consent, as it suggests only that there may be an opening for contractual establishment of "revocation procedure." No such revocation procedure is set forth by the contract in this case. Furthermore, this language undermines the holding in *Reyes* that a contract that does not directly discuss the right of revocation may impact that right. Rather, in order to establish "revocation

3

procedure," a specific clause directed at the issue would obviously be needed.

        B.        ***ACA International* Also Refutes Ally's Contractual Arguments.**

In setting forth its position that the Plaintiff had no right to revoke consent in this case, Ally is relying upon two contractual provisions: 1) a communications consent clause that makes no overt reference to any prohibition or limitation of revocation and 2) a clause that prohibits modification of the contract without the written agreement of Ally. However, these already infirm arguments as to interpretation of the contract are only further brought into disrepute by the reconfirmation in *ACA Int'l* "that consumers who have consented to receiving calls otherwise forbidden by the TCPA are **<u>entitled</u>** to revoke their consent," *ACA Int'l*, 2018 WL 1352922, at \*17 (emphasis added). Not only are Ally's arguments entirely inconsistent with this established right of consumers to revocation, but *ACA Int'l*'s reiteration of this right only further exposes the weakness of the contractual language Ally relies upon, namely communications clause's tepid statement that "[y]ou agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, **<u>as the law allows</u>**." (emphasis added). Given that the TCPA clearly "allows" revocation, this clause is entirely consistent with the notion that revocation is permissible! Revocation thus does not require modification of the contract but was rather "baked into the cake" when consent was contractually provided. Furthermore, to the extent that there might be an ambiguity as to the meaning of the contract, it would be interpreted against Ally as the drafter of the contract. *See Fisher v. Revell*, 343 S.W.3d 776, 783 (Tenn. Ct. App. 2009)("When a contract is deemed ambiguous, it will normally be construed against the drafter of the contract, who is responsible for creating the ambiguity.").

*ACA Int'l*'s reaffirmation that there is a general statutory entitlement to revocation also brings into play other contractual maxims. Here, Ally is in essence arguing that the Plaintiff has

4

waived the right of revocation through a clause that makes no mention whatsoever as to revocation. However, Under Tennessee law, "[w]aiver is a voluntary relinquishment or abandonment of a known right or privilege. Thus, when an individual does not know of his rights or when he fails to fully understand them, there can be no effective waiver of those rights." *Faught v. Estate of Faught*, 730 S.W.2d 323, 325–26 (Tenn. 1987). Furthermore, and more importantly, "[t]he rule is that there can be no waiver where there is no intent to waive." *Id.* at 326. As such, even if it is assumed that the Plaintiff knew of the right of revocation, something that has not been established but might be a question of fact, there is absolutely no evidence of an intent to waive the right of revocation when the relevant contract made **no mention whatsoever** of revocation. Ally's position that the inherently limited language of the instant contract reflected an intent to waive an unmentioned right is absolutely **objectively unreasonable**, making this issue ripe for summary judgment in favor of the Plaintiff.

## II.  PREDICTIVE DIALERS REMAIN AN ATDS AND SUBJECT TO THE TCPA.

From experience in other cases, Plaintiff' counsel anticipates that Ally will present arguments based upon the incorrect assertion that, in addition to invalidating regulations from the 2015 FCC Order, the D.C. Circuit's *ACA International* decision invalidated FCC regulations promulgated through 2003 and 2008[1] FCC Orders as well. This is plainly incorrect. Absolutely nowhere in the *ACA International* opinion is it stated that any FCC order (or portion of any FCC order) other than the 2015 FCC Order that was under review was invalidated.

---

[1]    Notably, the 2008 FCC Order was, in essence, a rejection of a challenge to the 2003 FCC Order by ACA International, the very same petitioner as in the D.C. Circuit case. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566 (2008). In rejecting this challenge, the FCC held that "ACA raise[d] no new information about predictive dialers that warrant[ted] reconsideration of [the 2003] findings." *Id.* at 566-67. This ruling was never overturned in any court proceeding.

As a threshold matter, Ally is likely to rely on the D.C. Circuit's pronouncement that "[w]e must therefore set aside the Commission's treatment of those matters" as support for its theorem that multiple FCC Orders were invalidated. Such conclusion is gravely misplaced. The **entire** paragraph in which this phrase appears reads as follows:

> In short, the Commission's **ruling**, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking. The **order's** lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the "capacity" to perform the necessary functions. We must therefore set aside the Commission's treatment of those matters.

*ACA Int'l v. Fed. Commc'nsComm'n*, 2018 WL 1352922, at \*12. As can be seen, the relevant paragraph uses the singular term "ruling" and the singular possessive term "order's," both quite obviously refer to the one order under review, the 2015 Order.[2] If there was any remaining doubt on that score, it was dispelled by the Court's earlier explanation that "[t]he [FCC's] **most recent effort** falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties in material respects on whether their equipment is subject to the statute's autodialer restrictions." *Id.* at 10 (emphasis added). This can only refer to the 2015 Order. As such, the phrase "treatment of those matters" clearly refers solely to the "treatment of those matters" in the 2015 Order. If the D.C. Circuit had intended otherwise, it would have, at a minimum, used the plural "rulings" and "orders,'" and almost certainly would have explicitly

---

[2]   It should further be noted that the joint petitioners in the *ACA International* appeal did not expressly request the invalidation of the 2003 or 2008 FCC Orders. Rather, at the conclusion of the portion of their opening brief that discussed the ATDS issue, the Petitioners merely requested that "the parts of the Order interpreting ATDS should be set aside." Petitioners' *ACA Int'l* Opening Brief, p. 39. "Order" was defined in the glossary of this brief as applying only to the 2015 FCC Order. Petitioners' *ACA Int'l* Opening Brief, p. xvii. Significantly, the 2003 FCC Order had a separate glossary entry, which, not surprisingly, indicated that this order would be referred to as the "2003 Order." Petitioners' *ACA Int'l* Opening Brief, p. xvii. In light of these facts, it is unreasonable to interpret the *ACA International* as granting relief that was not even expressly requested, namely the invalidation of the 2003 and 2008 FCC Orders.

specified the additional FCC Orders it was invalidating.

Ally will likely posit a mistaken proposition that the FCC determined it had the "authority" to overturn the 2003 and 2008 FCC orders by referring to language from the *ACA International* opinion that stated that

> [T]he [FCC] maintains that the court lacks jurisdiction to entertain petitioners' challenge concerning the functions a device must be able to perform. The agency reasons that the issue was resolved in prior agency orders—specifically, declaratory rulings in 2003 and 2008 concluding that the statutory definition of an ATDS includes "predictive dialers," dialing equipment that can make use of algorithms to "assist[ ] telemarketers in predicting when a sales agent will be available to take calls." . . . According to the Commission, because there was no timely appeal from those previous orders, it is too late now to raise a challenge by seeking review of a more recent declaratory ruling that essentially ratifies the previous ones. We disagree.

*ACA Int'l,* 2018 WL 1352922, at *10. This portion of the opinion, however, would not support a supposition that the 2003 and 2008 FCC Orders were overturned. To put the above excerpt in other words, the FCC took the position that **its 2015 Order** could not be reviewed regarding what constitutes an ATDS because it "essentially ratifie[d] the previous ones," i.e. the 2003 and 2008 FCC Orders. Specifically, the FCC argued that "[t]he [c]ourt lack[ed] jurisdiction, . . .over the [FCC's] statements summarizing its past disposition of issues addressed in prior orders that the [FCC] did not reconsider or reopen here [i.e., the 2015 Order]." FCC's *ACA Int'l* Brief, p. 8. The FCC was thus clearly trying to shield portions of **its 2015 Order** from review on the grounds that these portions merely summarized prior rulings. The D.C. Circuit disagreed with the FCC's position, concluding that the "pertinent pronouncements" **in the 2015 FCC Order** could not be shielded from review in that fashion because the 2015 FCC Order did not merely "reaffirm" these prior orders.

Indeed, the D.C. Circuit's focus on the fact that the 2015 FCC order was not simply a "reaffirmation" of prior orders is made evident by the following discussion of that in the opinion:

While the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view: that equipment can meet the statutory definition even if it lacks that capacity. The Commission reaffirmed its 2003 ruling insofar as that order had found predictive dialers to qualify as ATDSs. 2015 Declaratory Ruling, 30 FCC Rcd. at 7972-73 ¶¶ 12-14. And in the 2003 order, the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS. 2003 Order, 18 FCC Rcd. at 14,091 ¶ 131 n.432; *id*.at 14,093 ¶ 133. By reaffirming that conclusion in its 2015 ruling, the Commission supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers). The 2015 ruling correspondingly expresses that "predictive dialers" can differ from other "dialers that utilize random or sequential numbers instead of a list of numbers." 2015 Declaratory Ruling, 30 FCC Rcd. at 7973.

So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). It might be permissible for the Commission to adopt either interpretation. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

*ACA Int'l,*2018 WL 1352922, at \*11-12.  As can be seen from the above excerpt, the D.C. Circuit fundamentally had no quarrel with the regulatory framework that existed prior to the 2015 FCC order, namely the 2003 FCC Order's[3] "clear" pronouncement that, "while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the

---

[3]  Notably, the 2003 FCC Order was not subject to the "smartphone" criticism as the 2015 FCC order such that it could meet the "arbitrary and capricious" standard to be overturned on that grounds.  Smartphones were not used by "vast majority of citizens" at the time, but rather were largely nonexistent in light of the first iPhone being released in 2007 and the first Android device in 2008. Furthermore the D.C. Circuit's misgivings about including common consumer devices within the ambit of the TCPA are quite obviously of little assistance to Ally, as the accused ATDS that it operates is hardly a ubiquitous consumer item such as a smartphone but rather an industrial device designed to make millions of calls.  Finally and perhaps most importantly, the D.C. Circuit suggested a neat and tidy solution to the smartphone problem that did not invalidate any prior regulations, namely promulgation of a regulatory exemption for smartphones.  *See id.* at \*8 (proposing that the FCC could "fashion exemptions preventing a result under which every uninvited call or message from a standard smartphone would violate the statute").  Ally quite obviously would not benefit from any such exemption.

statutory definition of an ATDS."  *Id.*    Indeed, the court specifically suggested that this interpretation fell within the discretion of the FCC, noting that "it might be permissible for the Commission to adopt either interpretation." *Id.*   Rather, the D.C. Circuit's problem was with the FCC's 2015 Order, and that problem was that the 2015 Order "espouse[d][two]competing interpretations in the same order." *Id.*   Tellingly, the court also described this problem by stating that "[t]he [FCC's] **most recent effort** falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties in material respects on whether their equipment is subject to the statute's autodialer restrictions."  Id. at \*10 (emphasis added).  The "most recent effort" was, quite obviously, the 2015 FCC Order and only the 2015 FCC order.

In light of the above, it is well established that, as a result of the D.C. Circuit's invalidation of  from the 2015 Order, the state of the law is returned to that which existed before the 2015 Order, namely the law as described by the 2003 and 2008 FCC Orders.  *See Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect[.]")(internal citation omitted). This would be devastating to Ally's case because the *ACA Int'l* court found the 2003 order to be "|clear" in its pronouncement that "while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *ACA Int'l,*2018 WL 1352922, at \*11-12.

### III.     ACA International Has Not Changed The Law As To What Constitutes A Revocation.

Following service of Ally's Supplemental Memorandum (Doc. 105), the Plaintiff felt it appropriate to add this brief section on Ally's meritless "totality of circumstances" argument to further guide the Court.  To put it simply, there is nothing in the *ACA Int'l* opinion that suggests any changes to the relevant standard as to what statements must be made to constitute a

9

revocation. It making its arguments, it appears that Ally relies upon the following paragraph from the *ACA Int'l* opinion:

> The Commission instead concluded that "a called party may revoke consent at any time and through any reasonable means"—orally or in writing—"that clearly expresses a desire not to receive further messages." Id. at 7989-90 ¶ 47; id. at 7996 ¶ 63. In assessing whether a revocation request meets the "reasonable means" standard, the Commission said it would consider "the totality of the facts and circumstances." Id. at 7996 ¶ 64 n.233. One relevant factor is "whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens." Id. Another consideration is "whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request ... in that circumstance." Id.

ACA Int'l, 2018 WL 1352922, at *11-12. However, the D.C. Circuit made it clear that such language was directed at the "means" of revocation and "effort[s] to sidestep the available methods [of revocation] in favor of idiosyncratic or imaginative revocation requests," *id*., not at requiring an evaluation of other extraneous matters discussed by a called party when there has been a clear statement by the called party that calls should stop. More importantly, the FCC has held that the means of revocation used in this case are expressly authorized as being "reasonable," stating that "[c]onsumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location, among other possibilities." 2015 FCC Order, 30 FCC Rcd. 7996. The revocations here occurred "directly in response to a call initiated or made by a caller."

**CONCLUSION**

For the reasons set forth above, the inescapable conclusion that must be reached is that *ACA International* opinion only adds strength to the Plaintiff's already compelling case. Accordingly, this Court should DENY Ally's Motion for Summary Judgment and GRANT Plaintiff's Motion for Partial Summary Judgment.

Dated:  April 11, 2018.

Respectfully submitted,

*/s/ Shaughn C. Hill*
SHAUGHN C. HILL, ESQUIRE
Florida Bar No.: 105998
MORGAN & MORGAN, TAMPA, P.A.
One Tampa City Center
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone:  (813) 223-5505
Facsimile:   (813) 223-5402
Primary: SHill@ForThePeople.com
Secondary: LCrouch@ForThePeople.com
*Attorney for Plaintiff*
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of April 2018, the foregoing, PLAINTIFF'S BRIEF IN RESPONSE TO THIS COURT'S ORDER REQUESTING CLARITY ON THE RECENT D.C. CIRCUIT DECISION, was filed electronically in accordance with the Court's guidelines, using the Court's CM/ECF system, and a copy of which was served via electronic mail to the following:

**Alexandra N. Krasovec, Esq.**
**Scott Goldsmith, Esq.**
**DORSEY & WHITNEY, LLP**
600 Anton Blvd., Ste. 2000
Costa Mesa, CA 92626
Email:  krasovec.alexandra@dorsey.com
Secondary: claridge.vanessa@dorsey.com
Email: goldsmith.scott@dorsey.com
*Attorneys for Defendant*

**Eric J. Troutman, Esq.**
**WOMBLE BOND DICKINSON (US) LLP**
3200 Park Center Drive, Suite 700
Costa Mesa, CA 92626
Email: eric.troutman@wbd-us.com
*Attorney for Defendant*

**Robert F. Springfield, Esq.**
**BURR & FORMAN, LLP**
420 N. 20th St., Ste. 3400
Birmingham, AL 35203
Email: fspringf@burr.com
Secondary: sfoshee@burr.com
sthompso@burr.com
*Attorney for Defendant*

**Samuel Aitken Morris, Esq.**
**BURR & FORMAN, LLP**
511 Union St., Ste. 2300
Nashville, TN 37219
Email: smorris@burr.com
Secondary: agosnell@burr.com
casey@burr.com
*Attorney for Defendant*

*/s/ Shaughn C. Hill*
SHAUGHN HILL, ESQUIRE
Florida Bar No.: 105998