# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARTHA AMMONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-00505** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **ALLY FINANCIAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Martha Ammons brings suit against Ally Financial, Inc. ("Ally"), under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, <u>et seq</u>. This case arises out of hundreds of debt-collection telephone calls that Ammons claims Ally made to her cellular telephone. Before the Court are (a) Ally's Motion for Summary Judgment (Doc. No. 25) and (b) Ammons' Motion for Partial Summary Judgment (Doc. No. 69), both of which are fully briefed, including legal memoranda, exhibits, and an enormous amount of supplemental authority and related briefing. The Court also ordered additional briefing regarding the impact of <u>ACA International v. Federal Communications Commission</u>, 885 F.3d 687 (D.C. Cir. 2018) ("<u>ACA International</u>"), on this case. These motions are now ripe for decision. For the following reasons, Ally's motion will be denied in full and Ammons' motion will be granted in part and denied in part.

## I.     Background and Facts

In April 2014, Ammons[1] and her daughter purchased a Nissan Altima from Trinity Automotive dealership in Nashville, Tennessee.[2] (Doc. No. 35 at ¶ 2.) The purchase had two components: a credit application ("CA") and a retail installment sale contract ("RISC"). First, Ammons (who was listed as the "buyer") and her daughter (who was listed as the "co-buyer") obtained financing for the purchase via the CA. (Id. at ¶¶ 3-4.) In the "Applicant Information" section of the CA, Ammons provided the cellular telephone number that is at issue in this case.[3] (Id. at ¶¶ 5-6.) The CA provided that: "[b]y providing your cell phone number on this application, you are consenting to receive servicing and collection calls on your cell phone using an auto dialer or prerecorded message. This consent applies to the dealer, who is the originating creditor in this transaction, as well as any assignee who may purchase your credit contract from the dealer. " (Id. at ¶ 7.) The CA further stated that, "by signing below, you certify that you have read and agree to the terms. . . ." (Id. at ¶ 8.) Trinity Automotive transmitted the CA to Ally, which processed and approved it. (Doc. No. 25-2 at ¶ 4.)

---

[1] The record reflects that during the pendency of this lawsuit, Ammons has remarried and is now named Martha Blaire. (Doc. No. 69-2 at 1.) For the sake of clarity and consistency, and because her prior name is on all the relevant records in this case, the Court will adopt the parties' decision to continue to refer to Plaintiff as Martha Ammons.

[2] According to Ammons, her daughter could not purchase the vehicle without the benefit of Ammons' credit score. Ammons avers that the financier told her that she could be removed from the account in six months. Ammons' daughter always possessed the vehicle. (Doc. No. 69-1 at ¶¶ 4-8.)

[3] The actual number is known to the parties, but the Court need not disclose it here. Ammons is undisputedly the subscriber and primary user of the number. (Doc. No. 89 at ¶ 2.)

2

Next, Ammons and her daughter executed the RISC with Trinity Automotive. (Doc. No. 35 at ¶ 9.) Trinity Automotive then assigned its interests in the RISC to Ally. (Id. at ¶ 10.) In the "Servicing and Collection Contacts" section, the RISC states:

> You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

(Doc. No. 35 at ¶ 11.) The RISC also states that it "contains the entire agreement . . . relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding." (Id. at ¶ 12.) Finally, the RISC states: "You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it." (Doc. No. 25-4 at 1.) The RISC contains a choice of law provision that dictates both "federal law and the law of the state of Tennessee apply." (Doc. No. 35 at ¶ 14.)

In July 2015, Ammons began receiving automated calls from Ally to her cellular phone number to discuss a delinquency in payments that were due under the RISC. (Id. at ¶ 16; Doc. No. 69-1 at ¶ 9.) Based on her own testimony, Ally's call records and admissions, and her own non-exclusive, handwritten call logs,[4] Ammons alleges that Ally called her over 500 times between August 31, 2014 and January 24, 2017. (See Doc. Nos. 89 at ¶¶ 5, 8; 69-1 at ¶ 15.) However, based on various records, Ally suggests that there was a dramatically lower number of calls. (Doc. Nos. 86-2 at 13-16; 86-1 at 8-12; 69-8; 102 at ¶ 19.)

---

[4] According to her deposition testimony, Ammons "wiped" her phone clean several weeks prior to her deposition, gave it to her husband, and got a new phone. (Doc. No. 86-1 at 8-12.)

In her deposition, Ammons acknowledged that she didn't answer "a lot" of Ally's calls. (Doc. No. 86-1 at 37.) Ally's corporate representative, Diane Accurso, testified at her deposition that Ally "made" a substantially lower amount of calls than Ammons asserts, but conceded that this assertion only took into account calls where a representative actually spoke to Ammons or left a voicemail or text message. (Doc. No. 69-8 at 11.) In written discovery responses, Ally admitted that it "initiated" the following number of calls to Ammons' number using equipment with the capacity to operate as a predictive dialer: (a) after December 22, 2015: 518, (b) after September 22, 2016: 235; and after December 16, 2016: 64. (Doc. No. 69-3 at 5.)

The parties also plainly dispute if, how, and when Ammons instructed Ally's agents to stop calling her. (Doc. No. 89 at ¶¶ 7, 9.) Ammons testified that "from the beginning, [she] asked [Ally] to call [her daughter] instead of me." (Doc. No. 69-2 at 4.) But the calls kept coming, sometimes "four and five times a day." (Id.) Ammons testified that, in conjunction with directing Ally to her daughter, she told them "don't call me" on "several, a lot of times." (Id. at 5.) Two key dates in the parties' disagreements on this subject are December 22, 2015, and September 22, 2016. (Id.) Ammons contends that on December 22, 2015, she provided her daughter's information to Ally and asked Ally to stop calling her cell phone. (Doc. No. 69-1 at ¶ 11.) Ally, on the other hand, argues that records of the December 22, 2015, communication could be interpreted as Ammons instructing Ally to call Ammons' daughter, but not necessarily to stop calling Ammons.[5] (Doc. No. 89 at ¶ 7.) Likewise, Ammons contends that on September 22, 2016, she spoke to an Ally

---

[5] Ally suggests that Ammons' real goal was to be removed from liability on the account, not to be freed from debt collection calls. (Doc. No. 101 at 6.) However, Ally does not explain why these goals would have been mutually exclusive, or why Ammons would have wanted to be freed from the debt but to have kept receiving calls about it. In this vein, Ammons maintains that she sought both to be removed from the account and for Ally's calls to stop. (Doc. No. 102 at ¶ 30.)

agent – Mr. Body – and asked him to put a note in her file that Ally should stop calling her and call her daughter. (Doc. Nos. 69-1 at ¶ 12; 102 at ¶ 23; 86-1 at 12.) Ammons maintains that Mr. Body agreed that Ally would no longer call Ammons and stated that he would "put a flag on the account" so that no further automated calls would be made. (Id.) However, Ally contends that (1) its records do not confirm that it spoke with Ammons (as opposed to, e.g., Ammons' daughter), (2) Ammons' evidence is fundamentally confused, and (3) the evidence suggests that Mr. Body volunteered to stop the calls in error rather than agreed to stop them in response to a demand from Ammons. (Doc. No. 89 at ¶ 9.) Regardless, on September 22, 2016, a permanent note was entered on Ammons' account by Mr. Body that advised "dnc buyer!!!" (Id. at ¶ 11; Doc. No. 69-6 at 58.) Accurso has stated that "dnc" means "do not call."[6] (Doc. No. 89 at ¶ 12.) Again, Ammons has offered evidence that she received numerous calls after this date, but Ally has offered evidence that far fewer calls were made. (Id. at ¶ 13.)

On December 26, 2016, another Ally agent entered a comment on Ammons' account that stated "dnc buyer – in important note." (Doc. No. 69-6 at 26.) Ally contends that this was just the repeating of Mr. Body's September note; furthermore, Accurso testified that she would "not agree" that the person making this entry was under the impression that she should not be calling Ammons' telephone. (Doc. No. 86-2 at 19.) Ammons contends that Ally called her numerous times after this date, and, again, Ally disputes Ammons' account. (Doc. No. 89 at ¶¶ 16-17.)

---

[6] Mr. Body has submitted a curious Affidavit. He avers that – although he has *no* memory of Ammons – he can "say with confidence" that he was not asked by her to stop calls in September 2016. (Doc. No. 87 at ¶ 6.) He states that his notes – i.e., "dnc buyer!!!" are "*not* indicative of an understanding on [his] part that [Ammons] wished for calls to her cell phone to cease." (Id. (emphasis added).) As support for this counterintuitive assertion, Mr. Body offers the fact that he did not institute a "[Do Not Call Cell] workflow." (Id. at ¶¶ 5-6.)

5

On January 20, 2017, Ammons spoke to another Ally agent and reminded him about Mr. Body's promise. (Doc. No. 69-1 at ¶ 13.) In a recording of the January 20 call, Ammons can be heard saying: "I talked to Mr. Body about two months ago, and he told me that you all would stop calling me, that he is going to put a (inaudible) on my account." (Doc. No. 86-1 at 12.) In her deposition, counsel for Ally asked Ammons: "[D]o you feel like you clearly expressed to the agent that you did not want Ally to call your cell phone about the account ever again?" Ammons responded, "Yes. I mean, on that particular call, I do." When asked to explain "why," Ammons replied: "I mean, because I told him that I had asked the previous person to tell them not to call me. That meant all of them." (Id.) Ally's notes for the January 20 call states that Ammons "doesn't want calls anymore . . . says to call daughter." (Doc. No. 69-6 at 12.)

Ally has policies and procedures for consumer account servicing and collections that govern customer requests not to be contacted on their cell phone. (Doc. Nos. 92 at ¶ 4; 92-1 (Servicing Collection Policies and Individual Agreement).) According to Accurso, "in the face of a verbal request from a customer not to receive calls at a cell phone number, agents are required to initiate a DNCC (Do Not Call Cell) workflow." (Docs. No. 92 at ¶ 5; 92-2 (DNCC protocol).) The DNCC "wizard" requires multiple steps and, upon completion, is automatically updated in Ally's system for consumer accounts. (Docs. No. 92 at ¶¶ 6-8; 92-2.) Accurso also averred that, in conjunction with processing of a DNCC request, an Ally agent must also update the permission setting in the cell phone consent field associated with the cell phone number by changing that setting to "N". (Doc. Nos. 92 at ¶ 9; 92-3 (Calling Rules).) According to Accurso, notes in a customer's account are not the same as a DNCC workflow, even if they state "dnc buyer!!!" (Doc. No. 92 at ¶¶ 16-17.)

On January 24, 2017, extensive notes were placed into Ammons' account, including Ammons' (1) description of how the dealership told her she could get the car out of her name in six months and (2) request that Ally cease its "stressful" calling. (Doc. Nos. 86-2 at 20-22; 69-6 at 12.) While not explaining how these notes were any different than multiple other prior notes, including Mr. Body's "dnc buyer!!!" note, Ally maintains that January 24, 2017, was "the first time [Ammons] actually asked for calls to stop." (Doc. No. 102 at ¶ 29.) Accurso testified that this was when "the customer requested not to be called" under Ally policies and that Ammons' "request was honored." (Id. at 23.)

II.    Legal Standard

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at

7

479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

III.    Analysis

The TCPA prohibits use of an automatic telephone dialing system ("ATDS") to call a cellular telephone number without consent. 47 U.S.C. § 227(b)(1)(A)(iii). The parties' dispositive motions primarily turn on the question of consent. However, the Court must address several other matters before reaching that issue.

A.    Threshold Issues

First, Ally contests whether its predictive dialing system qualifies as the necessary ATDS under the TCPA. Second, Ally argues that its liability is limited because either (a) the harm to Ammons generally is not concrete or (b) the TCPA provides liability for only certain types of calls.

1.    Whether Ally's Predictive Dialer is an Automatic Telephone Dialing System Under the TCPA

"The term 'automatic telephone dialing system' means equipment which has the capacity[] (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. at § 227(a)(1). To avoid the need for certain discovery in this case, the parties entered into a stipulation that the telephone calls made by Ally to Ammons were "placed both manually and using a dialer. For only those telephone calls made using a dialer, the equipment has the capacity to operate as a predictive dialer." (Doc. No. 69-7.) This essential fact being undisputed, the pending motions debate whether Ally's predictive dialer qualifies as an ATDS within the meaning of §227(a)(1). Ally argues that predictive dialers like the one it has conceded to using fall outside the ambit of the TCPA, or, at the very least, that triable issues of fact exist concerning the ability of its predictive dialer to use a random or sequential number

8

generator. Ammons disagrees and contends that Ally's predictive dialer is an ATDS under applicable law.

Based on what appears at first blush to be unambiguous statutory language, § 227(a)(1) seems to dictate that the essential feature of an ATDS is that it uses "a random or sequential number generator." But the Federal Communications Commission ("FCC") has taken a different approach to interpreting § 227(a)(1).[7] Following on the heels of a 1992 Order in which the FCC stated that it was rejecting definitions that fit "only a narrow set of circumstances" in favor of "broad definitions which best reflect[ed] legislative intent [of the TCPA]," In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 7 F.C.C. Rcd. 8752, 8755 (1992) (hereinafter "1992 FCC Ruling"), the FCC in 2003 made "short-shrift of the requirement that an ATDS use a random or sequential number generator" by ruling that a system can qualify as an ATDS even if it does not "create and dial 10-digit telephone numbers arbitrarily" but rather "relies

---

[7] District courts "may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation[.]" Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1307 (11th Cir. 2015). That is because "[t]he Communications Act, which the TCPA amended, provides that any 'proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] must be brought under the Hobbs Act" and "[t]he Hobbs Act provides the federal courts of appeals with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity' of FCC orders." Id. at 1306-07 (quoting 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1)). Therefore, "[i]f the Hobbs Act applies, a district court must afford FCC final orders deference and may only consider whether the alleged action violates FCC rules or regulations." Id. at 1307. See also FCC v. ITT World Commc'ns, Inc., 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals."); Nack v. Walburg, 715 F.3d 680, 685 (8th Cir. 2013) ("The Hobbs Act provides that the courts of appeals have exclusive jurisdiction to determine the validity of FCC orders."); CE Design, Ltd. v. Prism Bus. Media, Inc., 606 F.3d 443, 450 (7th Cir. 2010) ("The Hobbs Act's jurisdictional bar thus does not leave private parties without a mechanism for judicial review of agency action; it merely requires litigants to seek review through its specific procedural path."); Penn v. NRA Grp., LLC, No. JKB-13-785, 2014 WL 2986787, at *3 (D. Md. July 1, 2014) ("This Court agrees . . . that the district courts have no authority to annul the effect of FCC rulings.") (collecting cases); see also U.S. v. Any and All Radio Station Transmission Equip., 204 F.3d 658 (6th Cir. 2000) (noting the difference between ruling on FCC regulations as opposed to the validity of final FCC orders).

9

on a given set of [phone] numbers." <u>Maddox v. CBE Group, Inc.</u>, Civil Action No. 1:17-CV-1909-SCJ, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018) (citing <u>In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991</u>, 18 F.C.C. Rcd. 14014, 14092 (2003) (hereinafter "<u>2003 FCC Ruling</u>")).

In 2008, the FCC issued an order that "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." <u>In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991</u>, 23 F.C.C. Rcd. 559, 566 (2008) (hereinafter "<u>2008 FCC Ruling</u>"). The petitioner prompting the <u>2008 FCC Ruling</u> had argued, among other things, that (1) the FCC's "determination that predictive dialers fall within the meaning of the statutory definition of 'automated telephone dialing equipment' was incorrect and conflicts with the language of the TCPA" and (2) the FCC had erred in 2003 because "debt collectors use predictive dialers to call specific numbers provided by established customers." <u>Id</u>. at 563, 566. Therefore, according to the petitioner, a predictive dialer should have only met the definition of an ATDS when it randomly or sequentially generated telephone numbers, not when it dialed numbers from customer telephone lists. <u>Id</u>. The FCC disagreed. Summarizing and reaffirming the findings of the <u>2003 FCC Ruling</u>, the FCC added that the petitioner "raise[d] no new information about predictive dialers that warrants reconsideration of th[o]se findings." <u>Id</u>. at 566-67. In 2012, the FCC clarified again that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." <u>In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991</u>, 27 F.C.C. Rcd. 15391, 15399 (2012) (hereinafter "<u>2012 FCC Ruling</u>"). In short, under the FCC's 2003 interpretation of § 227(a)(1), reaffirmed in the <u>2008 FCC</u>

Ruling and the 2012 FCC Ruling, a system may qualify as an ATDS by simply having "the *capacity* to dial numbers without human intervention." 18 F.C.C. Rcd. at 14092 (emphasis in original).

In 2015, the FCC went further and took the position that this interpretation meant that an ATDS need only have the future capacity to dial random and sequential numbers, rather than the present ability to do so. In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 7974 (2015) (hereinafter "2015 FCC Ruling"). The 2015 FCC Ruling was promptly challenged in the Courts of Appeal and eventually consolidated before the D.C. Circuit Court of Appeals in ACA International.[8] 885 F.3d at 687. In ACA International, the court held that the 2015 FCC Order made the TCPA's restrictions on autodialer calls "assume an eye-popping sweep" that could, with the future addition of software, bring any smartphone within the statutorily enumerated features of an autodialer. Id. at 696-97. The court rejected this interpretation of "capacity" as "an unreasonably, and impermissibly, expansive one." Id. at 700. Beyond this, however, the parties debate the impact of ACA International on the governing standard for autodialers. The Court finds the following explanation to be both succinct and persuasive:

---

[8] Although ACA International was decided by the D.C. Circuit, the decision is binding in this Circuit as well. See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc., 863 F.3d 460, 467 (6th Cir. 2017), as corrected on denial of reh'g en banc (Sept. 1, 2017) ("Once the Multidistrict Litigation Panel assigned petitions challenging the [FCC rule] to the D.C. Circuit, that court became "the sole forum for addressing . . . the validity of the FCC's rule[ ] . . . . And consequently, its decision striking down the [FCC rule] became 'binding outside of the [D.C. Circuit].'") (quoting Peck v. Cingular Wireless, LLC, 535 F.3d 1053, 1057 (9th Cir. 2008)); GTE S., Inc. v. Morrison, 199 F.3d 733, 743 (4th Cir. 1999) (holding other circuit assigned to hear challenge to FCC order "is now the sole forum for addressing challenges to the validity of the FCC's rules" and party "cannot take a second bite at the apple and also challenge the rules in this circuit").

Specifically, what <u>ACA International</u> did was to reject the FCC's have-your-cake-and-eat-it-too approach to the questions before it. [In the 2015 Ruling, t]he FCC was of "two minds on the issue" of whether "a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer," or whether "that equipment can meet the statutory definition even if it lacks that capacity." <u>Id</u>. at 701-02. The FCC answered "yes" and "yes," i.e., it must have that ability and it may lack that ability, two conflicting answers that the D.C. Circuit could not accept because it provided no meaningful guidance.

But what <u>ACA International</u> did <u>not</u> do is endorse one interpretation over the other, even implicitly. <u>ACA International</u> did not say that a predictive dialer, or any other type of device, must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer. Nor did it say that a predictive dialer, or any other type of device, may lack that capacity. In fact, the D.C. Circuit said that "[i]t might be permissible for the Commission to adopt either interpretation." <u>ACA Int'l</u>, 885 F.3d at 703 (emphasis added). But what the FCC could not do was "espouse both competing interpretations in the same order." <u>Id</u>.

In this case, [defendant] is essentially urging the [c]ourt to adopt the first interpretation – i.e., that a predictive dialer must be able to generate and dial random or sequential numbers to be an ATDS – based on <u>ACA International's</u> authority. But <u>ACA International</u> *does not compel that conclusion because it did not adopt that interpretation.* At best, <u>ACA International</u> *arguably* calls into doubt the FCC's previous broad statements that predictive dialers are ATDSs regardless of whether they call randomly or from a sequential list or a set list of numbers. *But perhaps not, given that the D.C. Circuit did not adopt one interpretation over the other. In any event, . . . absent an express rejection of the prior FCC orders, the Court cannot deviate from them and impose [its] own interpretation of the TCPA.*

<u>Reyes v. BCA Fin. Servs., Inc.</u>, --- F. Supp. 3d ---, 2018 WL 2220417, at *10-12 (S.D. Fla. May 14, 2018) (emphasis added). Indeed, beyond *not* expressly repudiating the <u>2003 FCC Ruling, 2008 FCC Ruling</u>, and <u>2012 FCC Ruling</u> discussed above, <u>ACA International</u> supports the conclusion reached in <u>Reyes</u> because the D.C. Circuit explicitly acknowledged the FCC's 2003 determination that, "while some predictive dialers cannot be programmed to generate random or sequential phone

12

numbers, they still satisfy the statutory definition of an ATDS." <u>ACA International</u>, 885 F.3d at 702.

In the wake of <u>ACA International</u>, this Court joins the growing number of other courts that continue to rely on the interpretation of § 227(a)(1) set forth in prior FCC rulings. <u>See</u> <u>McMillion v. Rash Curtis & Assocs.</u>, 2018 WL 3023449, at *3 (N.D. Cal. June 18, 2018) (stating that "<u>ACA International</u> invalidated only the 2015 FCC Order – [it] discusses but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order" and denying reconsideration of court's pre-<u>ACA International</u> order that the dialers at issue "were ATDSs because they possessed 'predictive dialing' capabilities which allowed them to operate without human intervention"); <u>Maddox</u>, 2018 WL 2327037, at *4 ("Given the <u>ACA Int'l</u> decision, the Court relies on the FCC's 2003 interpretation of § 227(a)(1) to determine if Defendant's system qualifies as an ATDS."); <u>Swaney v. Regions Bank</u>, Case No. 2:13-cv-00544-JHE, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018) ("In its 2003 Order, the FCC concluded that the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention.' In light of <u>ACA International</u>, that proposition still stands."); <u>Reyes</u>, 2018 WL 2220417, at *10-12 (S.D. Fla. May 14, 2018) ("BCA Financial reads too much into <u>ACA International</u> when it concludes that the prior FCC orders can no longer be relied upon. The Court rejects that argument."); <u>see also</u> <u>Lucas v. DeSilva Auto. Servs.</u>, Case No. 1:16-cv-790, 2018 WL 2020744, at *8 n.9 (S.D. Oh. May 1, 2018) (noting that <u>ACA International</u> had only "vacated several aspects of" the <u>2015 FCC Ruling</u>).

The Court is unpersuaded by Ally's contrary supplemental authority of <u>Herrick v. GoDaddy.com LLC</u>, --- F. Supp. 3d ---, 2018 WL 2229131 (D. Ariz. May 4, 2018), for several reasons. First, the Court simply disagrees with <u>Herrick's</u> conclusion that <u>ACA International</u> enables a court to "not defer to *any* of the FCC pertinent pronouncements" regarding the required

functions of an ATDS. Herrick, 2018 WL 2229131, at *8 (emphasis added). On its face and as discussed above, ACA International addressed only the confusion caused by the 2015 FCC Ruling. Second, Herrick is internally inconsistent. After disavowing the FCC's 2015 guidance regarding the definition of an ATDS, the court engages in the very analysis that the FCC suggested in the 2015 FCC Order – eventually concluding that the dialer at issue "lacked the *capacity to become* a device that could randomly or sequentially generate numbers to be dialed." Id. (emphasis added). Finally, the Herrick decision really rests on the issue of "human intervention." Curiously, regarding human intervention, the decision found that the FCC's prior pronouncements were still helpful and applied them. Be that as it may, human intervention is what truly doomed the Herrick plaintiff, because the defendant's dialer required such a level of human agency that it was completely disqualifying. Id. at *10.

Ally also relies on Marks v. Crunch San Diego, LLC, 55 F. Supp. 3d 1288, 1291 (S.D. Cal. 2014), a pre-ACA International decision. In Marks, the court took the view that the FCC's definitions of an ATDS – the subject of FCC orders for over 15 years – are not binding on district courts and have always been an impermissible attempt to modify the TCPA. Id. at 1291-92. Put kindly, this is a position that has been met with considerable disagreement, even within the federal districts of California. As discussed above, the Court finds the prevailing view to be that final FCC orders are binding on district courts. Beyond this, the D.C. Circuit in ACA International appeared to take *no* issue with the fact that the FCC has long attempted to define the parameters of an ATDS (rather, as discussed above, the Court took issue with *how* the FCC went about that task).[9] Marks is therefore not persuasive.

_____

[9] The Court also notes that the Ninth Circuit Court of Appeals stayed the appeal of Marks, No. 14-56834 (9th Cir. 2014) pending the decision in ACA International, and thus, pending the Court of Appeals' decision, Marks may soon be invalidated.

Accordingly, applying the appropriate standard here, the primary consideration . . . is "whether human intervention is required at the point in time at which [Ammons'] number [was] dialed." Strauss v. CBE Grp., Inc., 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016). But Ally has made no real argument that a human intermediary acts *then*. At most, Ally has averred that agents are available to intervene in calls *after* they have been initiated by the predictive dialer. (See Doc. No. 85 at 18-19.) As a matter of common sense, having operators standing by, to use an old phrase, to take a connected call is not "human intervention" in the dialer's *initiation* of calls. Compare with Marshall v. CBE Grp., Inc., No. 216CV02406GMNNJK, 2018 WL 1567852, at *4–8 (D. Nev. Mar. 30, 2018) (finding that, even if the 2003 FCC Ruling applied, where dialer involved a "point and click" system that required employees to trigger calls, the dialer was not an ATDS because it involved too much up-front human intervention); Smith v. Stellar Recovery, Inc., Civil Action No. 15-cv-11717, 2017 WL 1336075, at *5-7 (E.D. Mich. Feb. 7, 2017) (finding dialing system was not an ATDS because it was "configured in such a way that it cannot dial phone numbers without the 'clicker agents' initiating the call" by manually enabling communication between databases); Manuel v. NRA Grp., LLC, 200 F. Supp. 3d 495, 501-02 (M.D. Pa. 2016), aff'd 722 F. App'x 141 (3d Cir. Jan. 12, 2018) (explaining that "'[p]oint and click' systems requiring users to manually initiate each call uniformly necessitate human involvement," while "dialers with the capacity to initiate multifarious calls prospectively, before agents become available, fall within the ambit of the [TCPA]," and then holding that the predictive dialer at issue

---

15

was an ATDS because "uncontroverted evidence establishes that [it] is capable of placing calls without human intervention").

Accordingly, the Court finds as a matter of law that the stipulated predictive dialer used by Ally is an ATDS under § 227(a)(1) and the 2003 FCC Ruling. Ammons will be granted summary judgment on this issue.

### 2. Standing and the "Making" of Calls Under the TCPA

This Court has previously ruled that violations of the TCPA confer standing based upon particularized and concrete harms. See Cunningham v. Rapid Response Monitoring Servs., Inc., 251 F. Supp. 3d 1187, 1194 (M.D. Tenn. 2017). In considering Ally's motion to dismiss in this case, this Court held that, while the U.S. Supreme Court reiterated in Spokeo, Inc. v. Robins, 135 S. Ct. 1540, 1549 (2106), that merely asserting a "bare procedural violation, divorced from any concrete harm," will not satisfy the concreteness requirement of standing, "this observation has little application to claims under the TCPA, since [such] claims are not based on 'bare procedural' rights, but rather on substantive prohibitions of actions directed toward specific consumers." (Doc. No. 59 at 9 (quoting Mey v. Venture Data, LLC, 245 F. Supp. 3d 771, 776 (N.D.W.Va. 2017).) This Court then held that the "concrete harms" under the TCPA caused by telephone calls include depleting minutes, depleting cell phone battery and cost of electricity to recharge, invasion of privacy, intrusion upon capacity of cell phone, wasting time, and causing risk of personal injury due to distraction. (Id. at 6-7.) These harms are not limited to answered calls, and clearly contemplate reading texts, listening to voicemails, clearing call logs, recharging depleted power used by voicemails and missed calls, and the annoyance and intrusion of privacy associated even with missed calls and messages. (Id.) This Court further held that "[m]ost of the[] cases consider the calls received by the plaintiff as a whole instead of evaluating standing separately for each call

16

alleged to violate the TCPA." (Id. at 13 (citing Romero v. Dep't Stores Nat'l Bank, 199 F. Supp. 3d 1256 (S.D. Cal. 2016).) This Court concluded that "it is possible post-Spokeo to clearly demonstrate standing for numerous, actionable, similar calls." (Id.)

Ally attempts to resurrect its failed standing argument at summary judgment by relying on Hagy v. Demers & Adams, 882 F.3d 616 (6th Cir. 2018). But Hagy is of no assistance to Ally. Hagy, which is not a TCPA case, stands for the exact same principle as Spokeo – namely, that "[a]lthough Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." Hagy, 882 F.3d at 662 (emphasis added) (quoting Spokeo, 136 S. Ct. at 1548-49). Stated differently, Congress may not, without more, elevate a mere technical offense devoid of attendant real world harm into a substantive violation. What felled the plaintiffs in Hagy was that their case was based upon the sending of one letter that, although procedurally deficient under the Fair Debt Collection Practices Act (because it did not technically state that "the communication [wa]s from a debt collector," see 15 U.S.C. § 1692e(11)), did not in reality do "anything other than help" the plaintiffs. Hagy, 882 F.3d at 621-22. The Court of Appeals reiterated that Congress could not say that "anything" was an injury under the statute without "drawing that line" between violations that were merely procedurally objectionable and those that caused actual harm. Id. at 621-23. The instant case, however, involves alleged substantive violations of the TCPA accompanied by what this Court has explained to be traditional notions of non-trifling, justiciable harm. (See Doc. No. 59 at 5-11 (citing legislative history and relevant precedent).) Hagy, therefore, does not dictate that Ammons lacks standing. See, e.g., Romero v. Dep't Stores Nat'l Bank, --- F. App'x ---, 2018 WL 1079728, *1 (9th Cir. Feb. 28, 2018) (reversing grant of summary judgment on standing grounds

because "a violation of the TCPA is a concrete, de facto injury," noting that under Spokeo "[a] plaintiff alleging a violation under the TCPA need not allege any additional harm beyond the one Congress has identified," and concluding that the plaintiff "ha[d] shown that this concrete harm is fairly traceable to the defendants' challenged conduct).[11]

The Court also declines to embrace Ally's argument that because Ammons did not always answer her telephone, some volume of Ally's calls were not "made." (Doc. No. 85 at 22-23.) The plain language of the TCPA Act prohibits "*mak[ing]* any call . . . " § 227(b)(1)(A) (emphasis added). Ally is essentially suggesting that the statute's language not only requires that a call be "made" or placed using an ATDS, but that the owner of the cellular telephone number be contemporaneously aware of the call. "This argument, though linguistically intriguing, does not hold water" because "[t]he text of the TCPA . . . does not include such a requirement." Fillichio v. M.R.S. Assocs., Inc., No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010). In addition, Ally has neither identified any FCC regulations or orders that interpret the TCPA's prohibition to include such a requirement, nor cited any particularly convincing legal authority distinguishing "initiating" from "making" calls under the language of the TCPA. Cf. Patterson v. Ally Fin., Inc., Case No. 3:16-cv-1592-J-32JBT, 2018 WL 647438, at *2 (M.D. Fla. Jan. 31, 2018).

Indeed, persuasive authority holds that "the intended recipient *need not* have answered the calls. *The act of placing the calls triggers the statute.*" Yount v. Midland Funding, LLC, No. 2:14-CV-108, 2016 WL 554851, at *8 (E.D. Tenn. Feb. 10, 2016) (emphasis added); see also Bratcher v. Navient Solutions, Inc., 249 F. Supp. 3d 1283, 1286 (M.D. Fla. 2017) ("[T]he prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the intended recipient

---

[11] Ally previously offered the district court decision in Romero in support of its motion to dismiss on standing grounds. The Court rejected application of that decision. (Doc. No. 59 at 8.) The Romero decision has now been reversed by the Court of Appeals for the Ninth Circuit.

does not answer the calls. It is the mere act of placing the call that triggers the statute."); <u>Tillman v. Ally Fin. Inc.</u>, No. 2:16-cv-313-FTM-99CM, 2017 WL 1957014, at *7 (M.D. Fla. May 11, 2017) (finding that the plaintiff did "receive" calls even if plaintiff was away from his phone at the time of the unwanted calls and the calls went to voicemail, and noting that "transmission of the unwanted call would notify plaintiff that Ally was attempting to contact him, which is an intrusion upon seclusion that is an injury intended to be prevented by the statute");[12] <u>King v. Time Warner Cable</u>, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015) (holding that the Defendant "violated the statute each time it placed a call using its ATDS without consent, regardless of whether the call was answered by a person, a machine, or not at all"); <u>Fillichio</u>, 2010 WL 4261442, at *3 ("I decline to infer that requirement here, and rely on the plain language of the Act."); <u>see also</u> <u>Satterfield v. Simon & Schuster, Inc.</u>, 569 F.3d 946, 953-54 (9th Cir. 2009) (holding that "to call" in the TCPA means "to communicate with or *try to get in communication with* a person by telephone") (emphasis added). This caselaw reflects the overarching consumer protection mandate of the TCPA to safeguard against the invasion of privacy. <u>Mey</u>, 245 F. Supp. 3d at 775.

Accordingly, Ammons still has standing to bring her TCPA claims, and Ally faces potential liability for calls "made" to Ammons.

### B. Revocation of Prior Express Consent

The TCPA only prohibits calls made without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1). Accordingly, prior express consent is an affirmative defense to liability under the TCPA. <u>See, e.g.</u>, <u>Van Patten v. Vertical Fitness Grp., Ltd. Liab. Co.</u>, 847 F.3d 1037, 1044 (9th Cir. 2017); <u>Snow v. Glob. Credit & Collection Corp.</u>, No. 5:13-CV-721–FL, 2014 WL

---

[12] Ally did not notify the Court of <u>Tillman</u>, despite having the same counsel in that case and the instant case.

5781439, at *5 (E.D.N.C. Nov. 6, 2014); Andersen v. Harris & Harris, Ltd., No. 13-CV-867-JPS, 2014 WL 1600575, at *8 (E.D. Wisc. Apr. 21, 2014).

In 1992, the FCC clarified that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." 1992 FCC Ruling at 8769. In 2008, the FCC confirmed that "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." 2008 FCC Ruling at 564-65; see also Baisden v. Credit Adjustments, Inc., 813 F.3d 338, 344 (6th Cir. 2016) (noting that debtors "typically give their cellphone number as part of a credit application at the beginning of the debtor-creditor relations"). Under this standard, Ammons granted her express consent to be called when she entered into the CA and the RISC. See Ginwright v. Exeter Fin. Corp., 280 F. Supp. 3d 674, 682 (D. Md. 2017) (concluding same where plaintiff had signed and provided phone number in nearly identical credit agreement and retail installment sale contract); accord Huffman v. Branch Banking & Tr. Co., Civil Action No. 3:16-8637, 2017 WL 2177351, at *2 (S.D.W.Va. May 17, 2017). The consent clause of the RISC clearly states: "You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, *as the law allows*." (Doc. No. 25-4.) (emphasis added). There is no dispute that the "law" that governs the communications referenced in this clause is the TCPA. By the clear language of the RISC, therefore, the parties contemplated that Ammons' consent would be delimited by, at the very least, the TCPA.

The TCPA, however, is silent on whether and how a consumer may revoke previously-granted consent. In 2012, the FCC explained that "requests to stop receiving voice calls . . . can be

20

confirmed during the same call in which a consumer has expressed a desire to opt out." 2012 FCC Ruling at 15398. In 2015, the FCC analyzed revocability of consent in response to an inquiry by Santander Consumer USA, Inc. ("Santander"), a bank. 2015 FCC Ruling at 7993-99. Santander sought exemptions from TCPA liability for calls to debtors who furnished their phone numbers in connection with their accounts. Santander alternatively asked that, if the FCC chose to interpret consent as revocable, it allow callers like Santander to "designate a reasonable method that creates *a written record*" of revocation. Id. at 7993 (emphasis added). In other words, Santander wanted the FCC to sanction its imposition of written revocation conditions, presumably in its consumer credit agreement – i.e., by contract. See Galbreath v. Time Warner Cable, Inc., 2015 WL 9450593, at *3 (E.D.N.C. Dec. 22, 2015). The FCC declined Santander's request and clarified that "[c]onsumers have a right to revoke consent, *using any reasonable method including orally or in writing*. Consumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller." 2015 FCC Ruling at 7996 (emphasis added). The FCC continued: "Because the TCPA does not speak directly to the issue of revocation, the Commission can provide a reasonable construction of its terms. We agree with the Third Circuit that, 'in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of consumers.' We therefore find the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive calls or texts." 2015 FCC Ruling at 7993-94. Thus, the FCC concluded that "[a] called party may revoke consent *at any time and through any reasonable means. A caller may not limit the manner in which revocation may occur.*" 2015 FCC Ruling at 7989-90 (emphasis added).

The Sixth Circuit Court of Appeals has not addressed the issues of the method and timing of revocation of consent under the TCPA.[13] Currier v. PDL Recovery Grp., LLC, Case No. 14-12179, 2017 WL 712887, at *9 (E.D. Mich. Feb. 23, 2017). However, in recent years the Third and Eleventh Circuit Courts of Appeals have held that consent is revocable under the TCPA pursuant to the guidance of the FCC and relevant common law principles of consent. See Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 270 (3d Cir. 2013) (in context of credit application); Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1255 (11th Cir. 2014) (in context of insurance application); Schweitzer v. Comenity Bank, 866 F.3d 1273, 1280 (11th Cir. 2017) (applying Osorio and holding that consent can also be partially revoked depending on context);[14] see also, e.g., Bally v. First Nat'l Bank of Omaha, No. 17-10632, 2017 WL 4841420, at *2 (E.D. Mich. Oct. 26, 2017) (citing Osorio and holding that "[a] party may revoke his consent in writing or orally by "clearly express[ing] his or her desire not to receive further calls"); Kerner v. ConServe, Civil No. 16-cv-209-LM, 2017 WL 1025781, at *2 (D.N.H. Mar. 16, 2017) (citing Gager and Osorio and explaining that the majority of courts hold that revocation can be accomplished in writing or orally); see also Van Patten, 847 F.3d at 1048 ("Concluding that the reasoning of our sister circuits is persuasive and the FCC's interpretation of the TCPA is reasonable, we agree that the TCPA permits consumers to revoke their prior express consent to be contacted by telephone autodialing systems."); Johnston v. USAA Fed. Sav. Bank, No. 12-CV-02486-LTB-KLM, 2014 WL 5439965,

---

[13] In Baisden, our Court of Appeals affirmed the dismissal of an action on the basis on the granting of consent, however, that case turned on whether consent had been properly passed to a debt collector through an intermediary. Baisden, 813 F.3d at 344-349.

[14] The Schweitzer Court viewed the 2015 FCC Ruling as persuasive rather than binding authority because it was issued after the events in the case had taken place. See Schweitzer, 866 F.3d at 1277 n.1 (citing Osorio, 746 F.3d at 1256).

at *3-4 (D. Colo. Oct. 27, 2014) (holding that "the weight of authority suggests that consent may be revoked under the TCPA"); <u>Hitchman v. Nat'l Enter. Sys., Inc.</u>, No. 12-61043-CIV, 2014 WL 912363, at *2 (S.D. Fla. Mar. 10, 2014) (collecting cases concluding that consent may be revoked under the TCPA).[15]

As suggested above, in TCPA cases a consumer complaining about unwanted telephone calls often has a contractual relationship with the company placing those calls. <u>See</u> <u>Skinner v. Bluestem Brands, Inc.</u>, No. 3:14–CV–256–CWR–FKB, 2015 WL 4135269, at *2 (S.D. Miss. July 8, 2015) (collecting cases). When a consumer enters into a contract with a lessor, company, or service provider, the contract may require that the consumer provide her telephone number and consent to receiving automated or prerecorded calls. <u>See id</u>. However, according to <u>Gager</u>, <u>Osorio</u>, and their progeny, such a contract does not prevent a consumer from revoking her prior express consent pursuant to the TCPA. <u>See</u> <u>Gager</u>, 727 F.3d at 273-74 ("The fact that Gager entered into a contractual relationship with Dell did not exempt Dell from the TCPA's requirements. . . . Gager retained the right to revoke her prior express consent."); <u>Osorio</u>, 746 F.3d at 1255 (same); <u>Schweitzer</u>, 866 F.3d at 1277 (same); <u>Skinner</u>, 2015 WL 4135269, at *3-4 (same); <u>Cartrette v. Time Warner Cable, Inc.</u>, 157 F. Supp. 3d 448, 453 (E.D.N.C. 2016) (same); <u>Berg v. Verizon Wireless</u>, No. 13-CV-1-BBC, 2013 WL 8446598, at *1 (W.D. Wis. June 21, 2013) ("Nothing . . . suggests that consumers who consent initially in the context of a contractual relationship should be treated differently under the [TCPA].").

---

[15] Under the common law, consent is "given voluntarily." Black's Law Dictionary, 346 (9th ed. 2009); Restatement (Second) of Torts § 892 (stating that "[c]onsent is a willingness in fact for conduct to occur"). Further, at common law, consent may be withdrawn. <u>Id</u>., at § 892A, cmt. i (1979) (stating that "consent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct."). <u>Gager</u>, 727 F.3d 270-71. Finally, "[c]ommon-law notions of consent generally allow oral revocation." <u>Osorio</u>, 746 F.3d at 1255 (internal quotation and citation omitted).

23

Ally attempts to differentiate Osorio and Schweitzer based on the fact that the Eleventh Circuit stated therein that the plaintiffs could revoke any consent previously given "in the absence of any contractual restriction to the contrary." Osorio, 746 F.3d at 1255; Schweitzer, 866 F.3d at 1275. But this is of little consequence because here, as in those cases, the relevant contracts only address consent; there is *no* contractual provision that addresses, let alone restricts, revocation.[16] See Target Nat'l Bank v. Welch, 2016 WL 1157043, at *5 (M.D. Fla. Mar. 24, 2016) ("Target points to no provision in Ms. Ward's credit card agreement that precludes the oral revocation of her grant of prior express consent. Therefore, under the law of this Circuit, Ms. Ward was entitled to orally revoke her grant of prior express consent, its embodiment in the written credit card agreement notwithstanding.") (citing Osorio, 746 F.3d at 1255). Beyond that, however, this is a rehash of an argument Ally recently tried before another district court within the Eleventh Circuit in Patterson. In Patterson, the relevant contract had a "no oral changes" provision analogous to the one in the RISC here. The court noted that "courts in [the Eleventh] Circuit construe the words "in the absence of any contractual restriction to the contrary" narrowly in favor of "a Gager-like, common-law approach that permits oral revocation even in the presence of a contract." Patterson, 2018 WL 647438, at *5. Moreover, the Patterson court observed that the phrase was first recorded (and has never been expounded upon) in Osorio in 2014, "one year before the FCC unequivocally stated that a caller may not limit the ways a called party may revoke his consent." Id. at *5 (citing

---

[16] Ally's reliance on non-TCPA Tennessee caselaw holding that contracts cannot be unilaterally modified (Doc. No. 25 at 10-11) misses the mark for the same reason: there was no limitation on revocation to modify. To the extent Ally refers to the requirement that changes be only in writing and approved by Ally, this boilerplate requirement is not present in the CA. Furthermore, as discussed below, the Court finds that (a) consent to be called by an ATDS is not a material term of the RISC, and (b) such a generic provision can hardly be read to de-fang the entire TCPA. Put simply, the FCC has clearly admonished that "the consumer is not limited to using only a revocation method that the caller has established as one that it will accept." 2015 FCC Ruling at 7998.

2015 FCC Ruling at 7990). The court concluded that the 2015 FCC Ruling's admonition that "[a] caller may not limit the manner in which revocation may occur," had the force of law and abrogated prior FCC Orders and contradictory case law. Id. (citing Rodriguez v. DFS Servs., LLC, 8:15-cv-2601-T-30TBM, 2016 WL 369052, at *3 (M.D. Fla. Feb. 16, 2016)). Thus, even given the "in the absence of any contractual restriction to the contrary" language in Osorio and Schweitzer and a "no oral changes" contract clause, the Patterson court found "*nothing* in either the TCPA or the text of the contract(s) that preclude[d] Patterson from orally revoking his consent to be contacted." Id. (emphasis added). The Court finds Patterson to be a well-reasoned application of relevant Eleventh Circuit law that aptly addresses Ally's argument on this point.

Despite the "apparent clarity" of the 2015 FCC Ruling and complementary caselaw, Patterson, 2018 WL 647438, at *3, in 2017 the Second Circuit held that "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent." Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51, 56 (2d Cir. 2017). The Second Circuit "distinguished a gratuitously given telephone number from a number provided as part of an express contractual agreement; within the latter, the Second Circuit held, consent may not be revoked." Patterson, 2018 WL 647438, at *3 (citing Reyes, 861 F.3d at 57). The Second Circuit held that "Gager, Osorio, and the 2015 FCC Ruling [only] considered a narrow question: whether the TCPA allows a consumer who has freely and unilaterally given his or her informed consent to be contacted can later revoke that consent," not "whether the TCPA also permits a consumer to unilaterally revoke his or her consent to be contacted by telephone when that consent is given, not gratuitously, but as bargained-for consideration in a bilateral contract." Reyes, 861 F.3d at 56. The Reyes court further held that "the text of the TCPA evidences no intent to deviate from common law rules in defining 'consent,' and the FCC and other federal appellate courts have applied the

common law definition of the term when interpreting the act." Id. Because Reyes' consent was included as a provision of a lease agreement, the Second Circuit concluded that it was not revocable. Id. at 57. The Court noted that its ruling would make "revocation impossible in many instances," but disregarded that as a "hypothetical . . . public policy consideration" better suited for the halls of Congress. Id. at 58.

The Court finds the Reyes decision to be highly problematic for multiple reasons.[17] First, Reyes is at odds with the 2015 FCC Ruling, which calls for a right to revocation of consent at any time and through any reasonable means, written or oral. Importantly, even though the 2015 FCC Ruling, Gager, and Osorio are clearly informed by common law principles of consent, in the end the 2015 FCC Ruling expressly set forth a right of revocation pursuant to statute. See 2015 FCC Ruling at 7994-95 (noting that there was no evidence that Congress intended to override common law notions of the right to revoke consent and stating that its conclusion was "consistent with the common law," but explicitly stating that the FCC did "not rely on common law to interpret the TCPA to include a right of revocation" and declining to sanction the substitution of common law for statutory law); see also ACA International, 885 F.3d at 692 (acknowledging that court was

---

[17] The Court makes two preliminary observations about Reyes. First, Reyes is distinguishable from the instant case on the facts. In Reyes, the consent clause of the lease agreement read as follows: "You also expressly consent and agree to Lessor, Finance Company, Holder and their affiliates, agents and service providers may use written, electronic or verbal means to contact you." Reyes, 861 F.3d at 53-54. In this case, however, the RISC's consent clause is clearly modified by the phrase "as the law allows." (Doc. No. 25-4.) Accordingly, Reyes entered into a different, open-ended, unlimited bargain with his lessor where Ammons explicitly reserved the benefit of recourse to relevant law (i.e., the TCPA). Second, Reyes' basic characterization of itself as a "contract case" as opposed to a Gager-like "consent" case involving the "unilateral" providing of a phone number, is dubious. Gager (as here) involved a credit application that was returned with a grant of credit, so contractual arrangements were clearly involved. Moreover, Gager's credit agreement was made subject to state law. A good argument can be made, therefore, that "[t]he Third Circuit's decision . . . necessarily found that state contract law did not override Gager's rights under the TCPA." Skinner, 2015 WL 4135269, at *4 n.1.

26

reviewing determinations the FCC made pursuant to statutory authority under the TCPA). Thus, when the Reyes court advances a rationale based upon the fact that it is necessary to adhere to the common law of consent in the context of contracts, the court not only contradicts the 2015 FCC Ruling but fundamentally fails to address the 2015 FCC Ruling's statutory basis.

In addition, the 2015 FCC Ruling explained that to allow the *caller* to designate the exclusive means of revocation could "materially impair the rights" of consumers under the TCPA and specifically disclaimed the addition of "additional burdens," especially if "not repeated to the consumer with each message." 2015 FCC Ruling at 7997. The FCC stated that the "TCPA requires *only* that the called party clearly express his or her desire not to receive further calls. This common-sense understanding of revocation is consistent with the [FCC's] requiring easy means of revocation . . . while acknowledging that where Congress has intended that the means of revocation be limited, it has said so clearly." Id. (emphasis added). The Court finds it a bridge too far to conclude, that, where the FCC has found it inappropriate to limit revocation by any called party beyond a "reasonable" or "easy" means, the Reyes court could so easily eliminate any right to revocation for a potentially vast number of called parties.

Second, the unilateral-provision-of-number versus number-in-bargained-for-contract dichotomy that Reyes has set up is really "a distinction without a difference where[, in reality,] consumers' provision of their telephone numbers represents the *same* express consent as their signature on a contract" containing a consent clause. Cartrette, 157 F. Supp. 3d at 455 (emphasis added). Either way, the result is fundamentally the same: there is a debtor and a caller and the same concerns under the TCPA. But even if the Reyes dichotomy made any practical sense, and even if "the level of contact that a debtor will consent to may be relevant to the negotiation of a line of credit," Gager, 727 F.3d at 273-74, "the ability to use an autodialing system to contact a debtor is

27

plainly not an essential term to a [contract]," id. See also Ginwright, 280 F. Supp. 3d at 683 ("[I]t is not clear that the consent clause in the Credit Application could be construed as a bargained-for contract term."); Cartrette, 157 F. Supp. 3d at 455 (finding services agreement silent as to revocation failed to preclude right to revoke in part because it was a commonly used, non-negotiable form and use of an autodialing system was not an essential term of the agreement); Wright v. Target Corp., Case No. 14-cv-3031 (SRN/HB), 2015 WL 8751582, at *7 (D. Minn. Dec. 14, 2015) ("The essential terms of the parties' agreement related to use of the credit card, payments, interest charges, and the calculation of fees. The particular form and manner in which Target could contact Wright was not an essential part of the agreement."); Skinner, 2015 WL 4135269, at *3 (rejecting irrevocability argument in part because "the plain language of the contract did not address revocation of consent [and] the ATDS clause was not negotiable").[18]

Third, the Reyes court made a broad pronouncement regarding the presence of contractual provisions and resulting waiver of the right of revocation, but it did not address the difficulty in determining the scope and clarity of a consumer's waiver. More specifically, where the "consent" provision in the relevant agreement granted consent to be called *but did not mention revocation at all*, the Reyes court did not address why it was appropriate to implicitly find at summary judgment that a clear waiver of the right of revocation had occurred. Compare Reyes, 861 F.3d at 53 (where the lease agreement contained express consent to contact but no mention of waiver of right of revocation, not addressing clarity of waiver) with Skinner, 2015 WL 4135269, at *3 (in same

---

[18] Reyes's treatment of the essential terms issue passing at best. The court mentions at "'essential terms' are those terms that are necessary in order to lend an agreement sufficient detail to be enforceable by a court," Reyes, 861 F.3d at 58 (citing Brookhaven Hous. Coal. v. Solomon, 583 F.2d 584, 593 (2d Cir. 1978)), and concludes that "[c]ontracting parties are bound to perform on the terms that they did agree to, not what they might have agreed to under different circumstances." Id. To the extent this is not simply conclusory, it again relies solely on the concept that contract law overrides the TCPA.

28

circumstance, stating that "a waiver should be clear enough for a court to fairly conclude that the person knowingly and voluntarily intended to waive their rights" and concluding that "the language of this contract is not clear as to revocation of Skinner's TCPA rights").[19] Under Tennessee law, "when an individual does not know of his rights or when he fails to fully understand them, there can be no effective waiver of those rights." Faught v. Estate of Faught, 730 S.W.2d 323, 327 (Tenn. 1987). Moreover, our Court of Appeals has advised that to the extent that any contract provision is ambiguous (e.g., silent as to waiver of the right of revocation), it "should be construed against its drafter." Royal Ins. Co. of America v. Orient Overseas Container Line Ltd., 525 F.3d 409, 423 (6th Cir. 2008); Here, the CA and RISC simply do not show that Ammons clearly waived her TCPA right to revoke consent.

Finally, the history of the TCPA as a consumer protection statute obviously disfavors the Second Circuit's interpretation – a reading of the law that essentially ignores its stated public policy goals. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372 (2012) (explaining that the TCPA is designed to protect individual consumers from receiving intrusive and unwanted telephone calls). It is simply not possible to square the intent of the TCPA – namely, that a recipient can direct a caller to stop intrusive, privacy-invading future calls – with the concept that consent under the TCPA can become irrevocable once first provided in a contract. See Schweitzer, 866 F.3d at 1276 ("[A]llowing consent to be revoked orally is consistent with the government interest articulated in the legislative history" of the TCPA – namely, enabling the recipient of incessant and unwanted calls to 'tell[ ] the autodialers to simply stop calling.'") (quoting Osorio, 746 F.3d

---

[19] In Skinner, the plaintiff provided the defendant with her cell phone number and signed a contract containing the following language: "You expressly consent to receiving calls and messages, including autodialed and prerecorded message calls, from . . . [defendant], at any telephone numbers that you have provided." Skinner, 2015 WL 4135269, at *2. This language differs little in substance from that in Reyes.

at 1255-56); <u>Satterfield</u>, 569 F.3d at 954 ("The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy."); <u>Ginwright</u>, 280 F. Supp. 3d at 683 ("[A]dopt[ing] the prohibition on revocation in <u>Reyes</u> [ ] would result in the effective circumvention of the TCPA in the debtor-creditor context."); <u>Munro v. King Broad. Co.</u>, No. C13-1308JLR, 2013 WL 6185233, at *4 (W.D. Wash. Nov. 26, 2013) ("[A]llowing consumers to revoke consent is in line with the [remedial] purpose of the TCPA . . . to protect consumers from unwanted automated telephone calls and messages and [the TCPA] should be construed in accordance with that purpose.").

Indeed, under the <u>Reyes</u> reading, a debt collector could call a consumer, unbound by any sense of decency or fear of punishment, thousands and thousands of times as long as consent had initially been given in a "bargained-for" contract. <u>Compare with</u> <u>2015 FCC Ruling</u> at 7970 (noting that "an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA"). If this construction were so, a wide swath of the consumer base could likely be forced to contract away their rights under the TCPA or be unable to make purchases or obtain loans. <u>See, e.g.</u>, <u>Skinner</u>, 2015 WL 4135269, at *3-4 ("If they could [contract around the TCPA], one imagines that every company in the nation – from Dell Financial and State Farm Bank, to every student loan provider, to every catalog sales company – would amend their contracts to require customers to waive every right their customers currently have. . . . [N]o such race to the bottom is permitted."). For this reason, Ally's admission that "the contract at issue here was meant to completely eliminate Ammons' future ability to unilaterally revoke her consent" (Doc. No. 25 at 19) is telling. Ally maintains that Ammons' consent was "irrevocable" (Doc. No. 25 at 20) – meaning that Ally could call Ammons an

30

unlimited number of times over an unlimited period of time despite all manner of protestations. But the TCPA is a remedial statute that should be construed broadly to benefit consumers, Mey, 245 F. Supp. 3d at 775, and, thus, "should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers." Scarborough v. Atl. Coast Line R. Co., 178 F.2d 253, 258 (4th Cir. 1950). A remedial purpose will not justify reading a contractual provision "more broadly than its language and the statutory scheme reasonably permit." Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979) (quoting SEC v. Sloan, 436 U.S. 103, 116 (1978)). Furthermore, contracts (such as the CA and RISC) "must be construed consistent with common sense and in a manner that avoids absurd results." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 545 (6th Cir. 2007) (citation omitted). Finally, Ally's repeated argument that it "never agreed" to modify its contract with Ammons by ceasing its calls to her rings hollow – by its very nature the TCPA is not designed to secure Ally's "agreement," but, rather, to ensure its compliance.[20]

---

[20] Several other contract-based arguments offered by Ally to supplement Reyes fare no better. For example, in its reply brief, Ally contends (without any TCPA-related authority) that (a) if an oral modification to the RISC was made, it was not accompanied by consideration from Ammons and (b) Ally did not demonstrate a required "mutual assent" to Ammons' requests to stop calling her. (Doc. No. 44 at 2.) Nowhere does the TCPA require either of these things for a successful revocation of consent. See 2015 FCC Ruling at 7989-90 ("A called party may revoke consent at any time and through any reasonable means."). It would be completely contrary to the purpose of the TCPA for Ammons to have to offer consideration to get Ally to stop calling her, or for Ammons to wait for Ally to decide to agree or decline her request. Additionally, in a brief accompanying supplemental authority, Ally argues that Stevens-Bratton v. Trugreen, Inc., 675 F. App'x 563, 570 (6th Cir. 2017) compels something similar to Reyes via application of "normal principles of contract interpretation. (Doc. No. 82 at 4-5.) Stevens-Bratton is inapposite. That case involves the question of arbitration rights after the expiration of a contract. Also, in that case, there was an express contractual provision *allowing* revocation of consent. The court considered the issue of whether the defendant's right to call the plaintiff had accrued or vested under the expired agreement and stated that principles of contract interpretation might be used in that endeavor. Id. at 569. The Court eventually concluded that the defendant's right to call the plaintiff "is not the type of right that we typically view as accruing or vesting under a contract." Id. at 570. Stevens-Bratton does not dictate any particular outcome here. Moreover, nothing

31

Thus, the Court finds that the adoption of Reyes by other Circuits would represent a sea change in TCPA litigation in this country. Absent that wave or direct guidance to the contrary from our Court of Appeals,[21] the Court is not persuaded that Reyes controls the outcome here. See, e.g., Gager at 273-74 (holding that "[the company's] argument that its contractual relationship with [the customer] somehow waive[d] her rights under the TCPA is incorrect"); Ginwright, 280 F. Supp. 3d at 683 ("[Reyes'] prohibition on later revocation of consent arising from a boilerplate consent provision, however, would be inconsistent with the FCC's ruling that a consumer has "a right to revoke consent," 2015 FCC Ruling at 7996, including when originally provided in a credit application, id. at 7993 n.216, and with the remedial purposes of the TCPA, see Gager, 727 F.3d at 271. The [c]ourt therefore declines to adopt the prohibition on revocation in Reyes, which would

_____

herein suggests that the principles of contract interpretation that the Court of Appeals employed in that case are not generally applicable elsewhere.

[21] So far, Reyes has been followed as binding authority by two district courts in the Second Circuit. First, in Rodriguez v. Student Assistance Corp., No. 17-CV-01577 (BMC), 2017 U.S. Dist. LEXIS 183588, at *5-9 (E.D.N.Y. Nov. 6, 2017), the facts were somewhat distinguishable. Rodriguez involved a TCPA class action where the defendant, as part of the settlement, agreed to stop calling any class member who executed a "Revocation Request." Id. at *4. Those class members who did not do so remained subject to a settlement agreement that provided for compensation but ongoing calling by the defendant. Id. at *5. The plaintiff did not sign a Revocation Request. Id. The Court's ruling was dictated by Reyes. Id. at *5-9. Notably, the underlying settlement in Rodriguez contained a provision that stated: "To the extent Congress, the FCC or any other regulatory authority promulgates different requirements under the TCPA, or any other law or regulation that would govern any conduct affected by the [ ] [s]ettlement, those laws and regulatory provisions shall control." Despite this language, the court rejected the 2015 FCC Ruling's pronouncement that "a caller may not limit the manner in which revocation may occur" in favor of Reyes. Id. at *8. A second New York district court followed Reyes just this month, with little analysis. See Schneider v. Navient Solutions, LLC, No. 16-CV-6760 CJS, 2018 WL 2739437, at *2 (W.D.N.Y. June 7, 2018). The Court notes that a district court in this Circuit has recently cited Reyes with approval for the principle that "the TCPA does not permit a consumer who agrees to be contacted by telephone as part of a bargained-for transaction to unilaterally revoke that consent." See Barton v. Credit One Fin., 2018 WL 2012876, at *4 (N.D. Oh. Apr. 30, 2018). But that case essentially contains only one line of discussion and no analysis of contrary authority. Id.

result in the effective circumvention of the TCPA in the debtor-creditor context.");[22] Patterson, 2018 WL 647438, at *4 (evaluating Gager and Osorio on the one hand versus Reyes on the other and concluding that "Ally's assertion that the TCPA does not permit oral revocation is meritless"); McBride v. Ally Fin., Inc., Civil Action No. 15-867, 2017 WL 3873615, at *2 (W.D. Pa. Sept. 5, 2017) ("Gager is one of the strongest statements, in terms of interpreting revocation-of-consent consistently with the remedial purposes of the TCPA; and the [c]ourt cannot lightly cast aside language in Gager supporting a contrary conclusion [in Reyes]."); see also Wright, 2015 WL 8751582, at *7 (D. Minn. Dec. 14, 2015) (rejecting "bilateral-contract" argument, later endorsed in Reyes, in reliance on Gager); Brenner v. Am. Ed. Servs., 575 F. App'x 703, 703-04 (8th Cir. 2014) (per curiam) (suggesting that revocation of consent is permissible under the TCPA, Gager, and Osorio); Munro, 2013 WL 6185233, at *4 ("[Plaintiff's] interpretation of the statute does not require the court to re-write the TCPA.")

ACA International fully supports this analysis. There, the D.C. Circuit *began* its analysis by declaring that "[i]t is undisputed that consumers who have consented to receiving calls otherwise forbidden by the TCPA are entitled to revoke their consent."[23] ACA International, 885 F.3d at 709 (citing 2015 FCC Ruling at 7996). After reviewing the explaining the FCC's conclusion that a called party may revoke consent at any time and through any reasonable means – orally or in writing – that clearly expresses a desire not to receive further messages, the court rejected all of the petitioner's challenges thereto and "uph[e]ld the [FCC]'s approach to revocation

---

[22] As here, in Ginwright the relevant contract had a broad consent clause and a separate, boilerplate prohibition on oral modifications. Ginwright, 280 F. Supp. 3d at 678-79.
[23] Perhaps unsurprisingly, Ally describes this straightforward statement as "unnecessarily broad." (Doc. No. 105 at 4.)

of consent." Id. at 692, 709-710. That being said, there is one subsequent passage onto which Ally clings:

> Finally, petitioners object to the [2015 FCC Ruling] insofar as it might preclude callers and consumers from contractually agreeing to revocation mechanisms. The [FCC] correctly concedes however, that the ruling did not address whether contracting parties can select a particular revocation procedure by mutual agreement. The ruling precludes unilateral imposition of revocation rules by callers; it does not address revocation rules mutually adopted by contracting parties. Nothing in the [FCC]'s order thus should be understood to speak to parties' ability to agree upon revocation procedures.

Id. at 710 (internal quotation marks and citations omitted). But, as discussed above, this does not save the day because the parties here *did not contractually agree to a revocation mechanism*. In the absence of such an agreement, ACA International supports the FCC's objection to the very type of unilateral imposition of irrevocable consent that was sanctioned in Reyes and is advocated by Ally here.

From a bird's-eye view, the Court therefore concludes that: (a) the term "consent" is properly read to incorporate common law principles and at common law consent may be revoked; (b) allowing consumers to revoke consent is in keeping with the remedial, consumer-protection purposes of the TCPA, and the concept of irrevocable consent is fundamentally at odds with the TCPA's statutory scheme; (c) the FCC has provided clear authority under the TCPA that consumer consent may be revoked at any time by any reasonable means, and that a caller may not unilaterally limit those means; and (d) Gager, Osorio and their progeny are persuasive authority, Reyes is not persuasive authority, and ACA International supports this analysis.

However, the "issue of consent is ordinarily a factual issue," Thompson v. Louisiana, 469 U.S. 17, 23 (1984) (analyzing Fourth Amendment), and that holds true in the context of this

aggressively-disputed TCPA case. Viewing the totality of circumstances,[24] Ammons has put forth evidence about the calls made by Ally, her attempts at revocation, the means of revocation, and the timing of revocation, all of which are hotly disputed by Ally. Indeed, Ally disputes every aspect of this case, from whether Ammons "clearly expressed" her desire to stop receiving calls; to whether the phrase "stop calls" would have been reasonably understood to be Ammons' "instruction" versus an "articulation of an animating reason" for wanting to elude financial liability; to the meaning of Mr. Body's "dnc buyer !!!" entry; to the import of its own internal policies and procedures. Most obviously, of course, the parties disputes the facts surrounding the key interactions on December 22, 2015 and September 22, 2016, and the numbers of calls that followed thereupon. Ally's own call records provide evidence that could allow a reasonable jury to substantially question both Ammons' revocation or the number of inappropriate calls made by Ally. But, "[t]o be sure, a jury might also find against Ally on the evidence." (Doc. No. 85 at 13) (Ally brief.) The Court finds, therefore, that whether Ammons effectively revoked her consent clearly remains a disputed issue of fact.

Accordingly, the Court concludes that summary judgment is inappropriate concerning revocation of consent and, therefore, liability and damages. See, e.g., Herrera v. First Nat'l Bank of Omaha, N.A., 2017 WL 6001718, at *4 (C.D. Cal. Dec. 4, 2017) (stating that "factual dispute[s] regarding alleged revocation of consent cannot be properly resolved on summary judgment") (quoting Walker v. Transworld Sys., No. 8:14-cv-588-T-30MAP, 2014 WL 7225212, at *3, (M.D.

---

[24] "When assessing whether any particular means of revocation used by a consumer was reasonable, we will look to the totality of the facts and circumstances surrounding that specific situation, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request for revocation to the caller in that circumstance, and whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens." 2015 FCC Ruling at 7996; see also ACA International, 885 F.3d at 709 (endorsing "totality of circumstances" rubric).

Fla. Dec. 17, 2014)); see also Osorio, 746 F.3d at 1256 (finding that whether the plaintiff revoked

his consent, and related disagreement between plaintiff's claims and caller's records, was "exactly

the kind of factual dispute that cannot properly be resolved on summary judgment"); Patterson,

2018 WL 647438, at *6 ("Patterson says that he thrice told Ally to stop calling him. Ally contests

this assertion. This is precisely the type of factual dispute beyond the purview of summary

judgment."); Bally v. First Nat'l Bank of Omaha, No. 17-10632, 2017 WL 4841420, at *2 (E.D.

Mich. Oct. 26, 2017) (in TCPA dispute, denying summary judgment motion because "[r]easonable

minds could differ regarding whether [the p]laintiff clearly expressed his desire not to receive

further calls from [the d]efendant"); Dixon v. Monterey Fin. Servs., Inc., 2016 WL 3456680, *3

(N.D. Cal. June 24, 2016) (holding that consumer's statement to creditor of "I asked you guys not

to call me and you can contact my attorney" created an issue of fact as to revocation under the

TCPA) Buchholz v. Valarity, LLC, 2015 WL 590381, at *2 (E.D. Mo. Feb. 11, 2015) (even where

plaintiff told defendant to "stop calling him," finding more than a "metaphysical doubt"

concerning the effectiveness of revocation of consent and concluding summary judgment was

inappropriate); Smith v. Markone Fin., LLC, No. 3:13-cv-933-J-32-MCR, 2015 WL 419005, at *3

(M.D. Fla. Feb. 2, 2015) ("Disagreement over whether consent was orally revoked precludes

summary judgment.").[25]

---

[25] "If the court finds that the defendant willfully or knowingly violated [the TCPA], the court
may, in its discretion, increase the amount of the award to an amount equal to not more than 3
times the amount[.]" § 227(b)(3). Neither the TCPA nor FCC has defined these terms. "Courts
have generally resolved this ambiguity by requiring evidence of volitional conduct for each
element of liability, irrespective of any intent to transgress the [TCPA]'s prohibitions." Manuel,
200 F. Supp. 3d at 502 (citing Lary v. Trinity Physician Fin. & Ins. Servs., 780 F.3d 1101, 1107
(11th Cir. 2015); Davis v. Diversified Consultants, Inc., 36 F. Supp. 3d 217, 226-27 (D. Mass.
2014) (collecting cases). At this point, the evidence does not unequivocally show that even that
Ally is liable, let alone whether it "willfully or knowingly" violated the TCPA as a matter of law.
Indeed, even Ammons' briefing only states that she "strongly believes" that all of Ally's calls
were made willfully and/or knowingly. (Doc. No. 69 at 15.) Summary judgment on the willfully-

36

IV.     Conclusion

Ally's Motion for Summary Judgment (Doc. No. 25) will be denied. Ammons' Motion for

Partial Summary Judgment (Doc. No. 69) will be granted in part, regarding the conclusion that

Ally's predictive dialer is an ATDS under the TCPA, and otherwise denied.

The Court will file an accompanying order.


_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

or-knowingly damages issue is also premature and it, too, must be left for trial. See, e.g., Reyes,
2018 WL 2220417, at *13; Manuel, 200 F. Supp. 3d at 503; see also Liu v. Arrow Fin. Servs.,
LLC, 2010 WL 1994190, at *7 n.12 (S.D. Tex. May 17, 2010) (noting that debt collector's intent
and whether errors were bona fide are classic issues of fact inappropriate for resolution on
summary judgment).